In the Matter of HOME SAVINGS BANK OF THE CITY OF ALBANY, Petitioner. ASSOCIATES DISCOUNT CORPORATION et al., Respondents.

Supreme Court, Trial and Special Term, Albany County, August 24, 1949.

*Byrne, Casey, Keenan & Trombly* for petitioner.

*Reilly & Reilly* for themselves and other respondents.

*Kenneth S. MacAffer* for Hudson River Regulating District, respondent.

*Jack Goodman* for himself and other respondents.

*Seth D. Cole,* respondent in person.

BOOKSTEIN, J. This is a proceeding to fix the reasonable rentals of respondents as of May 28, 1948, under the provisions of the " Albany business rent control law " (L. 1948, ch. 679).

Section 5 of said law authorizes the fixing of a rent, exceeding the emergency rent, which, by section 3 thereof, is defined as the rent payable under a lease in force on January 28, 1948. Said section 5 provides that the rent to be fixed by the Supreme Court " shall be a reasonable rent based on the fair rental value of the tenant's business space as of the date the application to the supreme court * * * is made." Said section details the elements to be considered in arriving at the reasonable rent.

Section 5 of the law provides that " a net annual return of six per centum on the fair value of the entire property, including the land * * * shall be presumed to be a reasonable return. The assessed valuation of the entire property, including land and building, as shown by the latest completed assessment-roll of the city, shall be presumed to be the fair value of the premises, but other lawful evidence of the fair value may be offered and received ".

In the absence of other proof " what constitutes a reasonable rent for the commercial space * * * is to be arrived at by a mathematical computation in accordance with a formula set forth in the law ". (*Matter of Frankel [Hatters' Oakhide Boxes]*, 269 App. Div. 531, 533; *Schack* v. *Handel*, 271 App. Div. 1, 8).

In the latter case the court, speaking of the decision in the *Frankel* case (*supra*) said: " In that case the only proof introduced was on the part of the landlord. We held, in effect, that the formula set forth in the statute as indicating the presumptively fair return should be followed in the absence of other proof."

The assessed valuation of petitioner's property is $2,000,000, and under the statute, in the absence of evidence to the contrary, that would be presumed to be the fair value.

Respondents strenuously urge that petitioner is not charging itself a sufficient rental and that the assessed value of $2,000,000 should not be adopted as the fair value of the real property involved, despite the statutory presumption, because petitioner in its report to the Banking Department and to its depositors has depreciated the property to the point where it is carried on its balance sheet at $920,000 and because it discontinued two certiorari proceedings seeking a reduction in the assessed value to $1,700,000.

As to the rental charged by petitioner to itself, there is some justification for respondents' contention since the quarters occupied by the bank must be considered not alone on the basis of the number of square feet comprising its space. In addition there must be considered the fact that it occupies space that might well consist of the equivalent of the ground floor and two additional stories. Its quarters are specially constructed for banking purposes and necessarily, in accordance with banking practice, utilize a space which normally might well produce a substantially larger rent and to that extent reduce the amount of rent to be raised from the office space in order to produce a fair return. Moreover, there is considerable value, intangible though it may be and difficult of measurement in terms of dollars, in the fact that portions of the building not occupied by petitioner, both exterior and interior, are of advertising value for its primary business of banking. Indeed, the building is of a character that may be said to be monumental to petitioner and to its primary banking purpose. These observations are not, in any sense, a criticism. They are intended only to indicate that the petitioner's own rental cannot be fixed on the basis of the usual rent for a ground floor store, only, in the location occupied by it. The other elements mentioned require, at least certainly for the purpose of a proceeding such as this, that a higher rent be fixed for petitioner's own premises and that such increase should be $20,000.

As to the fair value of the real property involved in this proceeding, no expert opinion testimony was offered by either side, petitioner relying upon the statutory presumption that the assessed value is the fair value. Petitioner, as required by the statute, did offer in evidence the considerations paid by it for the land and building as entered on its books, the total of which exceeds the present assessed value, even if some of those items of consideration might be questioned as constituting items of cost. Even eliminating all such items, the cost is at least equal to the present assessed value.

Respondents claim the statutory presumption of fair value has been overcome first, by proof that petitioner in its report to the Banking Department and in its corresponding published statement of assets and liabilities has stated the value to be $920,000 and, second, by proof that for the years 1947 and 1948 petitioner instituted certiorari proceedings to have the assessed value of the property reduced from $2,000,000 to $1,700,000 and then discontinued such proceedings. The record discloses no reason for the discontinuance. The record does disclose, however, that in the certiorari proceedings the petitioner stated the value of the property to be $2,000,000. The inference is therefore inescapable that petitioner's proceeding was based not on an over-assessment but rather on inequality in assessments.

The history of the assessments shows that some years ago the property was assessed at $2,000,000; that certiorari proceedings were instituted which resulted in a reduction to $1,700,000 with corresponding refunds in taxes. The assessment remained at $1,700,000 for several years. In 1947 and 1948 it was increased to $2,000,000 and the proceedings heretofore referred to for a reduction to $1,700,000 were instituted and then discontinued. Had they continued to a successful conclusion the presumed fair value in this proceeding would have been $1,700,000 and to produce a 6% return on that amount would require $18,000 less than is required on the $2,000,000 value. In addition, the cost of operation would be reduced by a lesser amount of taxes, since the taxes would be 3/20ths less on the $1,700,000 assessment than on the $2,000,000 assessment, such reduction in taxes amounting to $12,660. These two items would reduce by $30,660 the amount of rent required to provide a 6% return on $1,700,000.

It is a matter of which this court will take judicial notice, because of the large number of certiorari proceedings which have been brought in this court, that it has been usually stipulated in such proceedings that real property in the city of Albany has been assessed at about 85% of its full value. Since petitioner in the discontinued certiorari proceedings has asserted that the full value of the property in question is $2,000,000, the establishment of that fact, would have resulted in a reduction of its assessment to $1,700,000. In that event, that figure would represent the presumed fair value in this proceeding.

Since the statute in question is predicated on the proposition of arriving at a reasonable rent — reasonable for the landlord, as well as for the tenant — the landlord owes a duty to its tenants to avoid or prevent or at least to redress an overassessment.

The statute makes the assessed value the presumed fair value; it makes the presumed fair value the basic amount upon which a 6% net return is to be allowed; and rentals naturally then have to be fixed to produce such return.

It makes a substantial difference whether the presumed fair value is $2,000,000 or $1,700,000. The difference in dollars and cents, both in taxes as an operating expense and in the amount required for a net return, has already been set forth.

The tenant is bound to pay a rent based on the assessed value, in the absence of any other evidence of fair value; he has no status to challenge the assessment, even though he has a vital interest in the amount thereof. Since the statute is designed to afford the landlord a certain return, which must be provided by the tenants, there is a duty on the landlord to protect the tenant against an unreasonable rent, based on an overassessment. Were it otherwise there would be an incentive on the part of the landlord to have the highest possible assessment, since the resulting taxes would have to be absorbed by the tenants as an operating cost and the difference between the 6% return on presumed fair value or actual assessed value and the 6% return on what the assessed value should and could be, as the result of certiorari proceedings, would make a handsome additional profit for the landlord at the expense of the tenants, since the tax on the additional amount of assessment is considerably less than 6% thereof. In this case the landlord would profit by the difference between $18,000 or 6% on $300,000 and $12,660, the amount of taxes on such $300,000 of alleged overassessment. By this discussion, this court does not mean to intimate that petitioner discontinued the certiorari proceedings from any such motive, even though the evidence discloses no reason why the proceedings were discontinued. Nevertheless, even if the best of motives animated the discontinuance, the same result followed. In view of the statute in question, the tenants are even more vitally interested in the assessed value, than the landlord, for which reason the landlord owed to the tenants the duty to continue the certiorari proceedings to a conclusion. Any incentive to a landlord to tolerate or court an overassessment should be removed, if the statute in question, which was intended as a " shield of protection," is not to be turned into a " sword of oppression."

Under the circumstances the court adopts as the fair value of the property in this proceeding the sum of $1,700,000. (Cf. *Schack* v. *Handel,* 271 App. Div. 1, *supra.*) On that basis petitioner is entitled to a net return of $102,000.

As to the book value of the property it is elementary that to effect a reduction in value of real property there must be actual depreciation and evidence thereof. Mere theoretical or book-keeping depreciation is not enough.

An examination of the depreciation account discloses the following:

| | |
|---|---:|
| Total cost of building as per books of petitioner | $1,909,824.02 |
| Total cost of land as per books of petitioner | 528,770.87 |
| Total cost of land and building | $2,438,594.89 |

On December 31, 1928, petitioner took a book depreciation of $9,594.89, which, except for a slight unexplained variance, which may be a mathematical error, amounts to ½ of 1% of the book building cost of $1,909,824.02. Thereafter in each of the years 1929, 1930 and 1931, it took a book depreciation of $18,000 or just under 1% per year. In each of the years 1932, 1933 and 1934, it took a book depreciation of $36,000 or just under 2% per year. On June 30, 1934, it took a book depreciation of $18,000 or just under 1%. On December 31, 1934, it took a book depreciation of $18,000 or just under 1%. On January 11, 1935, it took a book depreciation of $167,000; on June 30, 1935, it again took a book depreciation of $18,000 or just under 1%.

On December 31, 1935, and thereafter, semiannually, on June 30th and December 31st in each of the years 1936 and 1937, petitioner took book depreciation of $19,098.24 or precisely 1% of original book cost of the building.

In 1938, it took book depreciation quarterly, the first such item being on March 31, 1938, in the sum of $9,413.91 to arrive at an even accumulated total depreciation of $461,500. Thereafter in each of the succeeding quarters of 1938 and the first three quarters of 1939 it took depreciation of $9,500, a round figure slightly less than ½ of 1%.

On December 29, 1939, it took a book depreciation of $920,-094.89. This resulted in an accumulated depreciation on that date of $1,438,594.89. Subtracting that amount from original book cost left the building book cost balance at $471,229.13, which added to the undepreciated book cost of land, to wit, $528,770.87, left a total book cost of both land and building of precisely $1,000,000. Thereafter annually for the years 1944, 1945, 1946 and 1947, there has been taken a book depreciation of $20,000, or precisely 2% of the total depreciated cost, as of December 29, 1939, for both land and building of $1,000,000, so that as of January 1, 1948, the book cost of the land and building combined appears at $920,000.

No one could seriously urge that the depreciation items of $920,094.89 and $167,000 respectively represent actual depreciation. Those items are obviously arbitrary bookkeeping depreciation. To a lesser degree, perhaps, that is nevertheless also true of the remaining items of depreciation.

In *Matter of Fifth Madison Corp.* (*New York Tel. Co.*) (297 N. Y. 155) the petitioner attempted to charge in a proceeding such as this, annual depreciation as an item of cost. The court there said that there was no proof of actual depreciation. In fact and, on the contrary, there was proof of no depreciation since 1942. At page 161, the court said: " However depreciation may be treated as an accounting item in other situations * * * it may not be considered a cost within the meaning of the Business Rent Law."

Of course, the converse is not entirely true, i.e., in arriving at fair value, *actual depreciation* from original actual cost, may be taken into consideration. It is no less true, however, that theoretical depreciation or depreciation as an accounting item for the purposes of income tax, profit and loss statement or other accounting situation, cannot be given effect in arriving at fair value. More especially is this so where, as here, there is uncontradicted testimony that by reason of the manner in which this property has been maintained and the present cost of building, there has been no actual depreciation in the building involved in this proceeding.

The situation parallels the one in *Matter of Fifth Madison Corp.* (*supra*) where the court, at page 161, said: " Quite apart from the fact that war-induced shortages in rental space arrested and reversed the normal downward trend of the value of a building as it ages, one of the petitioner's own expert witnesses confirmed that there had been no depreciation in the value of this particular building since 1942."

Here, as there, we have testimony of no actual depreciation, which is sought to be overcome only by the fact that on its books petitioner has, for accounting purposes, taken various amounts of theoretical depreciation.

As to the book value of the real property in question, sound banking practice and conservative and prudent management of the depositors' funds may well justify the petitioner's book depreciation, in order that as rapidly as possible, the assets of a more fluid and liquid nature than the banking house and office building, shall be the assurance to depositors of the safety of their funds and the ability of petitioner to meet promptly

demands for withdrawals of depositors' funds. Yielding to such banking principles and practices, does not mean that petitioner is to be penalized by having the depreciated book figure of value used as the base for determining the amount of 6% net return on fair values and then having the amount of rent necessary to produce a net return so arrived at, fixed on such a base. Unless such book value truly reflects the fair value it cannot under the statute be adopted as such and be used as the base on which a fair return is to be computed. The only evidence received on the subject of actual depreciation demonstrates that there is no actual depreciation, despite the theoretical depreciation reflected in the book value of the property. In such case, using the depreciated figure as the fair value is not warranted. (See *Matter of Fifth Madison Corp., supra,* p. 161.)

The criticism of respondents that to grant the petitioner the precise relief which it seeks would result in an inordinate percentage increase in rents, has some force when consideration is given to the purpose for which the '' Albany business rent control law '' was enacted. It is true that, in the absence of the statute, petitioner could make any increase it sees fit. The object of the statute is to insure a reasonable rent to be paid by the tenant and a fair return to be had by the landlord. Any result which fails in accomplishing either purpose should be avoided if possible. Whether an inordinate increase, based on the statutory formula results from an emergency rent which was too low or from other factors is less important than the fact that an inordinate increase does occur. This court is not unmindful that under the New York City Commercial Rent Law an increase of from $225 to $324 per month was approved. (*Matter of Flushingside Realty & Construction Co.,* 186 Misc. 117, affd. as mod. 271 App. Div. 888.) However, there are factors present here with relation to the petitioner's own occupancy and intangible benefits to it already referred to that do not appear to have been present in that case.

Moreover, in *Schack* v. *Handel* (*supra,* at p. 8) the court said: '' The statute does not make the 6% * * * a precise measure of the return nor does it make said percentages the maximum or minimum return. They are figures as to which a statutory presumption of fair return is created.''

The fact that petitioner was willing by voluntary agreement, which was not availed of by respondents, to accept a lesser rent than the amount it now seeks, affords no basis for denial to

petitioner of the rent available under the statute. Petitioner, as a publicly owned institution, may, even, after this determination, as a matter either of creating or of retaining good will for its primary purpose of a savings bank institution, be willing to accept less than the statutory formula may allow. That is a matter for the sound judgment of petitioner. Such action, however, this court has neither the right nor the power to compel.

The conclusions herein reached lead to the following result:

| | | |
|---|---|---|
| Statutory return of 6% on $1,700,000.00 | | $102,000.00 |
| Cost of maintenance and operation May 1, 1947, to May 1, 1948................ | $168,263.58 | |
| Credit for profit from sale of electric current ........................... | 6,234.29 | |
| Net cost of maintenance and operation from May 1, 1947, to May 1, 1948.... | $162,029.29 | |
| Above figure reduced by $8,145.39, arrived at as follows:— | | |
| The above total of $168,263.58, includes real property taxes of $84,400.00 (less discount $844 or $83,556.00) on the basis of a $2,000,000.00 assessment. On the basis of a $1,700,000.00 assessment that figure would be reduced by $12,660.00. | | |
| Actually of course the bank has for the year 1947 and 1948 paid that amount. What the figure will be for the 1949 tax is problematical depending on whether the assessment in 1949 will be $2,000,000.00 or $1,700,000.00 or something in between. As the matter is necessarily speculative at the present time, the court is allowing 1/3 of the $12,660.00 as an expense. One third would amount to $4,220.00. To round off the figures, the court is increasing it to $4,514.61, which deducted from $12,660.00 leaves a difference of $8,145.39, by which amount the court is reducing the net cost of maintenance and operation .......... | 8,145.39 | |
| Net cost of operation May 1, 1947, to May 1, 1948........................ | | 153,883.90 |
| Amount to be derived from rents........ | | $255,883.90 |

There can be no question but that the outside office space is worth more than the court office space.

The amount to be derived from rents, to wit, $255,883.90 is to be as follows:

Reasonable and statutory rent for specialized spaces and because of locations:

|  |  | Annual Rent |
|---|---|---|
| 1. | Banking quarters and basement area used in connection therewith | $71,400.00 |
| 2. | Penthouse atop building | 1,800.00 |
| 3. | Naughter Jewelry Store | 6,000.00 |
| 4. | Palladino Barber Shop & Beauty Parlor | 3,100.00 |
| 5. | Room 210 and space below (Floor 2) | 2,520.00 |
| 6. | Rooms 204 to 209 incl. (Inner court, Floor 2) | 3,561.80 |
| 7. | 62,486.6 sq. ft. of outside office space at $2.50 per sq. foot | 156,216.50 |
| 8. | 5,642.8 sq. ft. of court space at $2 per sq. foot | 11,285.60 |
|  | Total reasonable and statutory rents | $255,883.90 |
|  | Total rents required to produce 6% net annual income on $1,700,000 | $255,883.90 |

All findings of fact and conclusions of law submitted by petitioner consistent with this opinion are found and all others are refused.

Submit order. No costs.